UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DAVID ROBERSON,
Individually and on behalf
of all other similarly
situated individuals,

       Plaintiff,

v.                  Case No.: 8:17-cv-769-T-33MAP

RESTAURANT DELIVERY DEVELOPERS,
LLC d/b/a DOORSTEP DELIVERY,
ANDREW BROWN, THOMAS COLANGELO,
WILLIAM MOORE, and DANIEL SINOR,

       Defendants.
_____/

**ORDER**

This matter comes before the Court upon consideration of Defendants Restaurant Delivery Developers, Andrew Brown, Thomas Colangelo, William Moore, and Daniel Sinor's Motion to Decertify Collective Action (Doc. # 80), filed on May 1, 2018. Plaintiff David Roberson filed his response in opposition on May 22, 2018. (Doc. # 85). For the reasons that follow, the Motion is granted.

**I.   Background**

A detailed history of this case is not necessary at this time. Roberson initiated this Fair Labor Standards Act action on March 31, 2017. (Doc. # 1). On July 11, 2017, Roberson

1

filed a motion for conditional certification, seeking to conditionally certify a nationwide FLSA collective action of Doorstep Delivery drivers. (Doc. # 25). Restaurant Delivery Developers opposed Roberson's motion for conditional certification, arguing that it is not the correct defendant for this action because it never held itself out as Doorstep Delivery and never hired Roberson or any other delivery driver. (Doc. # 43). The Court granted the motion and conditionally certified the collective action on September 18, 2017. (Doc. # 46). Because the question before the Court at the conditional certification stage was only whether a class of similarly situated Doorstep Delivery drivers exists and whether those drivers would be interested in opting in, the Court did not address whether Restaurant Delivery Developers really was Doorstep Delivery. (Id. at 7-8).

With the Court's leave, Roberson filed a Second Amended Complaint on April 23, 2018, asserting an FLSA overtime claim (Count I) and an FLSA minimum wage claim (Count II) on behalf of the collective action class members, as well as an individual Florida state law minimum wage claim brought by Roberson only. (Doc. # 77). The Second Amended Complaint added the four individual founders of Restaurant Delivery

2

Developers — Andrew Brown, Thomas Colangelo, William Moore, and Daniel Sinor — as Defendants.

Now, after the close of class discovery, Defendants seek to decertify the collective action. They argue again that Defendants never hired or contracted with any delivery drivers and that, regardless, the opt-in Plaintiffs are not similarly situated. (Doc. # 80). Roberson has responded, (Doc. # 85), and the Motion is ripe for review.

## II. **Legal Standard**

The FLSA expressly permits collective actions against employers accused of violating the FLSA's mandatory overtime provisions. See 29 U.S.C. § 216(b) ("An action . . . may be maintained against any employer . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated."). Certification of an FLSA collective action is typically a two-stage process. Morgan v. Family Dollar Stores, Inc., 551 F.3d 1233, 1260 (11th Cir. 2008)("[W]e have sanctioned a two-stage procedure for district courts to effectively manage FLSA collective actions in the pretrial phase."); see also Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1219 (11th Cir. 2001).

"The focus at each stage is on whether the proposed group of plaintiffs contains individuals who are 'similarly

3

situated.'" Schumann on behalf of Tidwell v. Collier Anesthesia, P.A., No. 2:12-cv-347-FtM-29CM, 2017 WL 1361524, at *1 (M.D. Fla. Apr. 14, 2017). While the Eleventh Circuit has "refused to draw bright lines in defining similarly," it has observed that "as more legally significant differences appear amongst the opt-ins, the less likely it is that the group of employees is similarly situated." Morgan, 551 F.3d at 1261 (citing Anderson v. Cagle's, 488 F.3d 945, 953 (11th Cir. 2007)).

"The first step of whether a collective action should be certified is the notice stage," also known as the "conditional certification" stage. Morgan, 551 F.3d at 1260-61. "The purpose of this stage is to determine whether there exists a group of other similarly situated employees who should be notified of the action and provided the opportunity to join." Schumann on behalf of Tidwell, 2017 WL 1361524, at *2. The required showing of "similarity" at this stage is "not particularly stringent," Morgan, 551 F.3d at 1261, and "is based primarily on pleadings and affidavits." Anderson, 488 F.3d at 953. Once the case is conditionally certified, notice is provided to the proposed group of employees, who must affirmatively opt-in to join the suit. Schumann on behalf of

<u>Tidwell</u>, 2017 WL 1361524, at *2 (citing <u>Morgan</u>, 551 F.3d at 1259; <u>Anderson</u>, 488 F.3d at 950).

"The second stage is the 'decertification' stage, so named because it is triggered by a defendant's motion to decertify the representative class 'after discovery is largely complete and the matter is ready for trial.'" <u>Allen v. Hartford Fire Ins. Co.</u>, No. 6:16-cv-1603-Orl-37KRS, 2017 WL 3701139, at *4-5 (M.D. Fla. Aug. 25, 2017)(quoting <u>Hipp</u>, 252 F.3d at 1218). At the decertification stage,

> the court has much more information on which to base its decision, and [it] makes a factual determination on the similarly situated question. If the claimants are similarly situated, the district court allows the representative action to proceed to trial. If the claimants are not similarly situated, the district court decertifies the class, and the opt-in plaintiffs are dismissed without prejudice. The class representatives — i.e.[,] the original plaintiffs — proceed to trial on their individual claims.

<u>Hipp</u>, 252 F.3d at 1218. The decertification stage is "less lenient" than the notice stage, and named plaintiffs "bear a heavier burden." <u>Morgan</u>, 551 F.3d at 1261.

At this stage, courts consider the following factors: "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendants that appear to be individual to each plaintiff; and (3) fairness and procedural considerations." <u>Id.</u> Although

the class members need not "'hold identical positions, the similarities necessary to maintain a collective action under § 216(b) must extend beyond the mere facts of job duties and pay provisions' and encompass the defenses to some extent." Morgan, 551 F.3d at 1261-62 (quoting Anderson, 488 F.3d at 953). Ultimately whether to decertify a collective action "rests largely within the district court's discretion." Morgan, 551 F.3d at 1261 (quoting Anderson, 488 F.3d at 953).

## III. **Analysis**

In their Motion, Defendants argue that Restaurant Delivery Developers was not the employer of any delivery drivers. (Doc. # 80 at 2). They present the affidavits of the four individual Defendants, all averring that Restaurant Delivery Developers was not a delivery company and never recruited, hired, or contracted with any delivery drivers. (Doc. # 80-1). Instead, Defendants describe Restaurant Delivery Developers as a consulting company, which was founded by the four individual Defendants. According to Defendants, Restaurant Delivery Developers merely helped establish local restaurant delivery companies that would use the Doorstep Delivery name — essentially franchises — in different geographic areas. (Id.). The restaurant delivery companies were located in ten different states: Florida,

6

Tennessee, Texas, Maryland, North Carolina, New York, Indiana, Georgia, Colorado, and Massachusetts. (Doc. # 85 at 5; Doc. ## 24, 47-54, 57-60, 63).

These restaurant delivery companies, of which there were a total of nineteen at one point, used delivery drivers who had signed independent contractor agreements with a third-party company. (Id.; Doc. # 80 at 4-5). If the delivery drivers were actually employees under the FLSA, Defendants assert that the delivery drivers were employees of that third-party company, Delivery Drivers Inc. (DDI), or the local restaurant delivery companies. (Doc. # 80 at 2-3). Defendants attach a copy of the independent contractor agreement between DDI and Roberson. (Doc. # 80-3).

The Court need not address the issue of whether Defendants were truly employers under the FLSA at this juncture. Whether Defendants were the delivery drivers' employers is not the issue before the Court. The only question before the Court is whether the opt-in Plaintiffs are similarly situated to one another such that this action may proceed as a collective action.

Perhaps realizing this, Defendants also argue that Roberson and the opt-in Plaintiffs are not similarly situated enough to maintain this collective action. (Doc. # 80 at 11-

18). There are 848 opt-in Plaintiffs, making for a total of 849 Plaintiffs. (Doc. # 85 at 2, 21). In determining whether plaintiffs are similarly situated, courts consider the following factors: "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendants that appear to be individual to each plaintiff; and (3) fairness and procedural considerations." <u>Morgan</u>, 551 F.3d at 1261.

### A.   <u>Disparate Factual and Employment Settings</u>

For the first factor, disparate factual and employment settings of the individual plaintiffs, courts consider:

> (1) whether the plaintiffs all held the same job title;
> (2) whether they worked in the same geographic location;
> (3) whether the alleged violations occurred during the same time period;
> (4) whether the plaintiffs were subjected to the same policies and practices, and whether these policies and practices were established in the same manner and by the same decision-maker; and
> (5) the extent to which the actions which constitute the violations claimed by plaintiffs are similar.

<u>Whineglass v. Smith</u>, No. 8:11-cv-2784-T-23TGW, 2013 WL 2237841, at *7 (M.D. Fla. May 21, 2013)(citations omitted).

Here, the opt-in Plaintiffs were all delivery drivers at the various restaurant delivery companies. All claim they

were misclassified as independent contractors when they were,
in fact, employees.

But Defendants insist there was great variety between
the opt-in Plaintiffs' employment settings and requirements.
Among other things, Defendants allege that "the record shows
dissimilarities in the evidence relevant to (1) the nature
and degree of DDI's control over the manner in which courier
services are performed; (2) the extent of Plaintiffs'
investment in equipment and use of subcontractors; and (3)
the degree of permanency and duration of the Parties' working
relationship." (Doc. # 80 at 14). Without any citations to
record evidence, Defendants assert the following:

> Plaintiffs signed up to work for DDI with vastly
> different frequency and regularity. Some work up to
> seven days per week. Others work only sporadically.
> They accept or decline job offers with variable
> frequency and have a variety of reasons for doing
> so. Plaintiffs additionally receive different
> levels of training. Some receive no instruction,
> while others have ride-alongs and undergo training
> sessions. They likely engage in a variety of
> activities while waiting for delivery offers. Some
> make deliveries using their own personal vehicles,
> while others have vehicles designated specifically
> for the job. Many work contemporaneously for other
> companies. They wear a variety of types of apparel
> when working, and are not required to wear a
> uniform. And while some Plaintiffs have provided
> services to DDI over the course of years, others
> have come and gone in a matter of weeks or even
> days.

(Id.).

Nevertheless, the burden is on Roberson to show that the collective class members are similarly situated. See Morgan, 551 F.3d at 1261 ("This second stage is less lenient, and the plaintiff bears a heavier burden [than at the conditional certification stage]."). To meet his burden, Roberson presents affidavits from himself and three opt-in Plaintiffs describing their work conditions — the same affidavits Roberson presented at the conditional certification stage. (Doc. # 85-8; Doc. # 85-9; Doc. # 85-10; Doc. # 85-11). All four — Roberson, Ken Sessa, Stephanie Martinez, and Akeem McLeod — worked in Tampa delivering food to customers. They all received assignments from a mobile app or through a Doorstep customer service representative's phone call, and were required to follow customer service representatives' instructions during assignments. (Id.). They all aver that there were weeks when they did not make minimum wage because they had to cover their own expenses. (Id.). And they claim there were weeks when they worked over 40 hours but they never received overtime pay. (Id.).

Roberson, Martinez, and Sessa stated they would be penalized for not making their assigned deliveries or for failing to follow a customer service representative's instructions. Specifically, they would have their "job

assignments taken away, or lose [their] scheduled shifts."
(Doc. # 85-8 at 2; Doc. # 85-9 at 2; Doc. # 85-10 at 2).
Roberson and McLeod averred they were "subject to
termination" if they did not meet performance expectations.
(Doc. # 85-8 at 2; Doc. # 85-11 at 2). All four state they
were required to wear a Doorstep Delivery uniform shirt and
badge and place a Doorstep Delivery car topper on their cars,
with money taken out of their pay each week for these items.
(Id.). Roberson and Sessa both averred they were "required to
us a pizza bag and a soda tray." (Doc. # 85-8 at 2; Doc. #
85-9 at 2). McLeod stated he was "required to use a special
bag for food deliveries." (Doc. # 85-11 at 2). Martinez does
not mention being required to use special bags, pizza bags,
or soda trays. (Doc. # 85-10 at 2).

These four affidavits do not convince the Court that the
over 800 opt-in Plaintiffs are similarly situated. These four
individuals all worked for the same Tampa restaurant delivery
company, while the collective action includes opt-in
Plaintiffs from nineteen local restaurant delivery companies
founded with Restaurant Delivery Developers' help. These
different companies had various owners and general managers,
and were located across ten states. That delivery drivers in
Tampa shared similar work requirements does not convince the

11

Court that work conditions were similar for all delivery drivers. No affidavits or deposition testimony from delivery drivers in any other city have been provided by Roberson.

Roberson also notes that a manual was created by Restaurant Delivery Developers for distribution to each local restaurant delivery company. In a section entitled "Key Points to Remember for Restaurant Presentation," the manual states: "Our mobile waiters are always in uniform including red polo shirts, black or khaki pants, no visible tattoos or facial piercings. They are a big step above a typical pizza delivery guy." (Doc. # 85-4 at 11). Additionally, in a section on customer service and the importance of consistency, the manual advises: "It is important to be consistent with estimated delivery times being accurate, updating the customer if it will be late, drivers wearing same uniform, always carrying thermal bag . . . . Name tags should be worn by all drivers." (Id. at 21-22).

Also, the franchise agreement between Restaurant Delivery Developers and the Jacksonville restaurant delivery company states: "Franchisee must operate the Business in accordance with the System and Manual, as amended by us in our discretion." (Doc. # 85-13 at 17). Thus, Roberson reasons, delivery drivers for the various restaurant delivery

12

companies were all required to follow the conditions described in the manual. Additionally, Roberson emphasizes the deposition testimony of Defendant Sinor. Sinor testified that he was not aware of any significant difference in the job duties, rules, and requirements for delivery drivers between the different restaurant delivery companies. (Sinor Dep. Doc. # 85-6 at 93:10-19).

This evidence is also insufficient to establish that Roberson and the opt-in Plaintiffs worked in similar employment settings and their claims share a similar factual basis. First, many important aspects of delivery drivers' work are not addressed in the manual at all, such as a required number of shifts, what drivers could do between deliveries during their shifts, whether drivers should be penalized for refusing deliveries or for not signing up for shifts for an extended period of time. So, the manual and franchise agreement do not show that delivery drivers at the various restaurant delivery companies shared similar requirements for these important aspects of their work.

Next, Restaurant Delivery Developers' distribution of the manual to its licensed restaurant delivery companies does not show that each restaurant delivery company actually implemented policies from the manual. Nor does a line in a

standard-form franchise agreement support that, in reality, the licensed restaurant delivery company followed all the manual's policies. Indeed, Sinor testified that Restaurant Delivery Developers merely "suggested" how general managers should run certain aspects of the local restaurant delivery companies, such as marketing, what software to use for dispatching drivers, and what discount rates to apply to food costs. (Sinor Dep. Doc. # 85-6 at 39:1-11, 40:12-41:10, 96:2-13). The extent to which the policies outlined in Restaurant Delivery Developers' manual were implemented by — and the degree to which Restaurant Delivery Developers and the individual Defendants otherwise controlled — the nineteen restaurant delivery companies will necessarily vary. Roberson has presented no evidence concerning the restaurant delivery companies outside of Tampa.

Additionally, Roberson's deposition testimony about the Tampa restaurant delivery company indicates potential differences that would undermine certification. For example, Roberson states that delivery drivers were required to work four shifts per week. (Roberson Dep. Doc. # 80-2 at 73:3-12). Additionally, even though only a total of four shifts were required for the week, drivers in Tampa had to work at least two days out of Thursday, Friday, Saturday, and Sunday. (Id.

at 28:22-29:3, 30:7-13). Yet, Roberson admits that once he did not work for ten days straight but was able to resume work without facing discipline. (Id. at 74:8-75:5). So, if there was a requirement that all delivery drivers work four shifts or cease delivering food for the Tampa restaurant delivery company, it was not always applied evenly. No evidence has been presented about the required number of shifts for delivery drivers at any of the other eighteen restaurant delivery companies. And, again, neither the manual nor the franchise agreement specify a minimum number of shifts.

Even if the four-shifts-per-week requirement was evenly enforced and existed for all nineteen restaurant delivery companies, it still presents problems for adjudicating matters on a collective basis. Each shift was either five and a half hours, from 10:30AM to 4PM, or six and a half hours, from 4PM to 10:30PM. (Doc. # 85-8 at 1). So, four shifts accounted for twenty-six hours of work at most — less than a full forty-hour work week. Yet, Roberson said he worked many more than the required four shifts. He testified he worked sixty to seventy hours per week, for which he maintains he should have been paid overtime for all hours over forty. (Roberson Dep. Doc. # 80-2 at 77:7). Surely, if the over 800

15

opt-in Plaintiffs were only required to work a maximum of twenty-six hours per week, at least some did not work over forty hours per week. Therefore, not all the opt-in Plaintiffs worked overtime and so would not be entitled to overtime pay.

In short, Roberson has not established that the opt-in Plaintiffs from the numerous restaurant delivery companies had similar factual and employment settings. This factor weighs in favor of decertification.

**B.    Defenses Individual to Each Plaintiff**

For the second factor, concerning the various defenses that may apply individually to different Plaintiffs, Defendants contend this factor "likewise supports decertification." (Doc. # 80 at 16). Defendants do not elaborate as to what individualized defenses exist; however, it is clear Defendants intend to argue that the delivery drivers were independent contractors. Defendants noted earlier in their Motion that the FLSA economic realities test — to determine whether a plaintiff is an independent contractor or employee — requires a fact-intensive inquiry ill-suited to collective adjudication. (Id. at 12).

"[F]or purposes of the certification analysis, the Court must assess whether Plaintiffs 'are similarly situated with respect to the analysis it would engage in to determine

16

whether the workers are employees or independent contractors. . . . [I]t must determine whether the proof to demonstrate that the workers are employees or independent contractors can be applied to the class as a whole.'" Carrera v. UPS Supply Chain Sols., Inc., No. 10-60263-CV, 2012 WL 12860750, at *8 (S.D. Fla. Sept. 14, 2012)(quoting Bamgbose v. Delta-T Group, Inc., 684 F. Supp. 2d 660, 668–69 (E.D. Pa. 2010)). Under the economic realities test, courts in the Eleventh Circuit consider the following in determining an individual's employment status:

> (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;
> (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
> (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;
> (4) whether the service rendered requires a special skill;
> (5) the degree of permanency and duration of the working relationship; and
> (6) the extent to which the service rendered is an integral part of the alleged employer's business.

Scantland v. Jeffry Knight, Inc., 721 F.3d 1308, 1312 (11th Cir. 2013).

In their Motion, Defendants acknowledge that many of the economic reality considerations — "opportunity for profit and loss depending on managerial skill, degree of skill required

to perform services, and integrality of services rendered" — "might be capable of proof on a class-wide basis." (Doc. # 80 at 14). But they insist the other considerations weigh against collective adjudication because of the differences between the drivers who worked at different restaurant delivery companies. (Id. at 14).

Roberson retorts that all elements of the FLSA economic realities test can be evaluated collectively. (Doc. # 85 at 15-20). For example, Roberson reasons that the question of control "will be easily adjudicated on a collective basis." (Id. at 16). Roberson argues the operations manual drafted by Restaurant Delivery Developers and the franchise agreements with the various restaurant delivery companies establish that Restaurant Delivery Developers "retained a right to exercise uniform control" over the licensed companies. (Id.).

The Court agrees with Defendants. Their defense concerning whether the delivery drivers were independent contractors should not be handled collectively. See Demauro v. Limo, Inc., No. 8:10-cv-413-T-33AEP, 2011 WL 9191, at *3 (M.D. Fla. Jan. 3, 2011)("The economic realities test is fact intensive and requires individualized analysis. Accordingly, a number of courts have determined that whether an individual is an independent contractor or an employee is not appropriate

18

for determination on a class-wide basis."). There are over 800 opt-in Plaintiffs who worked at the nineteen different restaurant delivery companies in various states. Roberson has not presented affidavits, deposition testimony, or other evidence of how delivery drivers outside of Tampa worked or were treated by the other restaurant delivery companies. Without such evidence, the Court is not persuaded that the economic realities test can be adjudicated on a collective basis.

Furthermore, even if the Court were able to determine that all opt-in Plaintiffs were employees, Defendants would still have other individualized defenses available to them. Depending on the variety of hours each driver worked, Defendants would likely argue that some drivers never worked overtime or some drivers always received the minimum wage for their work. The potential variability of hours worked — and the total lack of evidence presented by Roberson as to the hours worked by all but four Plaintiffs — support that the inquiry into whether overtime hours were worked and minimum wages were paid will be highly individualized.

This factor also weighs in favor of decertification.

## C.   Fairness and Procedural Considerations

Finally, Defendants argue the third factor — fairness and procedural considerations — weighs in favor of decertification. (Doc. # 80 at 17). According to Defendants, the burden this collective action would impose on a jury would be "immense." (Doc. # 80 at 17). And the "result of collective adjudication would be an impermissible 'all or nothing' determination" of liability, such that Defendants may have to compensate Plaintiffs who were not actually aggrieved. (Id.). Roberson disagrees. He contends that decertification would not be in the interest of efficiency and fairness. (Doc. # 85 at 20-21). Regarding efficiency, Roberson notes "[t]here are 849 total plaintiffs, meaning that decertification could necessitate hundreds of individual trials." (Id. at 21). And, according to Roberson, "pooling the drivers' resources is vital in a case like this, and many drivers would be prevented from pursuing individual claims." (Id.).

"While, surely, pooling the resources of individual Plaintiffs with small claims benefits those Plaintiffs, the Court must also determine whether trying such claims together is an efficient use of the Court's resources." Rodriguez v. Niagara Cleaning Servs., Inc., No. 09-22645-CIV, 2010 WL 11505505, at *5 (S.D. Fla. Dec. 14, 2010), clarified on denial

of reconsideration, No. 09-22645-CIV, 2010 WL 11505747 (S.D. Fla. Dec. 28, 2010). The Court also must consider "whether it can coherently manage the class in a manner that will not prejudice any party." Briggins v. Elwood TRI, Inc., 882 F. Supp. 2d 1256, 1263 (N.D. Ala. 2012)(citation and internal quotation marks omitted). Here, proceeding as a collective action is not an efficient use of the Court's resources and presents a significant risk of prejudice to both parties. Although the Court understands Roberson's desire to proceed as a collective action, efficiency and fairness weigh against proceeding as such. The large number of opt-in Plaintiffs asserting highly-individualized claims supports that it is more efficient to adjudicate their claims individually. See Demauro, 2011 WL 9191, at *4 ("This necessarily individualized assessment [of whether each opt in sedan driver was an employee or independent contractor] eviscerates all notions of judicial economy that would otherwise be served by conditional class certification.").

An all-or-nothing determination of whether all opt-in Plaintiffs were independent contractors or employees could prejudice either Plaintiffs or Defendants. Even if all opt-in Plaintiffs were found to be employees, the variety of hours each delivery driver may have worked increases the likelihood

that opt-in Plaintiffs may be awarded damages for non-existent work hours or awarded a smaller amount of damages than they are truly owed. See Rindfleisch v. Gentiva Health Servs., Inc., 22 F. Supp. 3d 1295, 1304 (N.D. Ga. 2014)("[T]he fairness factor articulated in Anderson necessitates decertification. The Court cannot determine a proper amount of overtime damages if this matter proceeds as a collective action when a number of Plaintiffs did not actually work overtime while employed by Gentiva. More to the point, it would be a miscarriage of justice for Gentiva to pay overtime damages to a subset of Plaintiffs who are not actually owed any overtime damages."); see also Mathis v. Darden Restaurants, No. 12-61742-CIV, 2014 WL 4428171, at *5 (S.D. Fla. Sept. 1, 2014)("Defendants would face all-or-nothing liability for large groups of employees, despite those employees' dissimilar working conditions. Individual Opt-In Plaintiffs would not receive recoveries based on their individual experiences. Rather, they would be grouped with other Opt-In Plaintiffs and receive either windfalls or insufficient recoveries.").

To avoid such inequitable all-or-nothing determination, "the Court would be forced to utilize numerous subclasses, individualized evidence, individualized liability

determinations, and individualized damage determinations." Mathis, 2014 WL 4428171, at *5. "Under those circumstances, a collective action no longer poses benefits in terms of manageability or fairness and is not preferable to individual actions spread across the appropriate federal venues nationwide." Id.

Thus, the third factor weighs in favor of decertification.

## IV.  Conclusion

Each of the three factors weighs in favor of decertification. Based on the evidence presented by the parties, the Court cannot conclude that Roberson and the opt-in Plaintiffs are similarly situated. Therefore, the Court decertifies the collective action. Defendants' Motion is granted. The opt-in Plaintiffs' claims are dismissed without prejudice. See Rodriguez, 2010 WL 11505505, at *5 ("[T]he claims of the opt-in Plaintiffs are dismissed without prejudice, and the allegations of the opt-in Plaintiffs in the Amended Complaint are stricken as moot." (citing Hipp, 252 F.3d at 1218)). "To avoid prejudice to the individual opt-in Plaintiffs who may choose to file their own cases, the Court invokes its equity power to toll the applicable statute of limitations for 20 days following the issuance of this

Order." Rodriguez, 2010 WL 11505505, at *5. The case remains pending as to Roberson's individual claims.

Accordingly, it is now

**ORDERED**, **ADJUDGED**, and **DECREED**:

(1) Defendants' Motion to Decertify Collective Action (Doc. # 80) is **GRANTED**.

(2) The claims of all opt-in Plaintiffs are hereby **DISMISSED WITHOUT PREJUDICE**. The applicable statute of limitations is tolled for 20 days following the issuance of this Order.

(3) This action shall proceed for Roberson's individual claims.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 20th day of June, 2018.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE